## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 16 2016, 7:10 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jay E. Millen,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

September 16, 2016

Court of Appeals Case No.
84A04-1602-CR-256

Appeal from the Vigo Superior Court

The Honorable John T. Roach, Judge

Trial Court Cause No.
84D01-1410-MR-2583

**Najam, Judge.**

# Statement of the Case

Jay Millen appeals his conviction for obstruction of justice, a Class D felony, following a jury trial. Millen presents a single issue for our review, namely, whether the State presented sufficient evidence to support his conviction. We affirm.

# Facts and Procedural History

On June 8, 2014, a boater found a headless human corpse in the Wabash River in Terre Haute. An autopsy revealed that, in addition to the decapitation, the corpse had sustained four stab wounds and a large abdominal incision. And the results of the autopsy indicated that the cause of death was homicide. The dead man was subsequently identified as Michael Pollack.

On June 11, while investigating Pollack's murder, Vigo County Sheriff's Detective Jim Palmer spoke with a friend of Pollack's, Jeffrey Thomas, who said that, prior to his death, Pollack had been staying at a makeshift camp near the river. Thomas also told Detective Palmer that a man at that makeshift camp had "made advances" towards Pollack. Tr. at 843. Based on the information provided by Thomas, including a physical description of the man, detectives found Millen living in a makeshift camp along the river and questioned him about Pollack.

Detectives told Millen that they were investigating the death of a man found in the river, and they showed Millen a photograph of Pollack. Millen denied ever having seen, met, or known Pollack. Detectives also asked Millen whether he

had any weapons, such as knives, and Millen denied having any weapons at his campsite. Detective Jason Fischer asked Millen again whether he had any knives, and Millen responded that "he did not like edged weapons [and he] had nothing in the camp that had an edge to it." *Id.* at 475.

[5] Detective Fischer asked Millen to come to the Sheriff's Department to give a recorded interview, and Millen agreed. During the interview, detectives told Millen that Pollack's body was found in the river just south of Millen's campsite, and they again showed Millen a photograph of Pollack. Millen repeatedly stated that he did not recognize or know Pollack. However, subsequent investigation turned up surveillance video of Millen using Pollack's EBT[1] card and PIN to make purchases at a nearby Dollar General store on June 1. When confronted with that video evidence, Millen said

> that he . . . did in fact remember Mr. Pollack. . . . [Millen had seen Pollack] as he was on his way to the Dollar General. He said Mr. Pollack looked sick. Mr. Pollack gave him his EBT card and the PIN to go get him a drink at the . . . Dollar General and bring it back to him.

*Id.* at 484. On June 17, detectives interviewed Millen again and collected buccal swabs from him. Detectives then drove Millen to his girlfriend's daughter's house and "instructed [him] to stay away from the camp" because

---

[1] "EBT" stands for electronic benefits transfer.

they were conducting an investigation using "luminol"[2] and they did not want "somebody walking up behind" them during that investigation. *Id.* at 530. Despite those instructions, detectives later found Millen at a location near the campsite watching the detectives' search.

[6] During the search of Millen's campsite, detectives found a folding pocket knife and a "filet-type knife or letter opener" with a "decorative handle" ("decorative knife"). *Id.* at 405. Detectives tested the knives for the presence of blood and found none. Accordingly, while detectives removed some items that revealed the presence of blood from the campsite, they left the pocket knife and decorative knife where they had found them.

[7] On June 30 and July 1, detectives with canine units conducted searches of Millen's campsite and surrounding areas. At some point, Millen spoke to Kora Coffin, a recent acquaintance, and told her that he was being investigated for possible involvement with Pollack's murder. And sometime in July, Millen gave Coffin and her fiancé, Jamar Wade, the decorative knife, which Millen referred to as a "letter opener,"[3] and Millen asked Coffin and Wade to "hold onto it for him." *Id.* at 387. Millen did not tell Coffin why he was asking them

---

[2] Luminol is a substance used to conduct certain types of investigations at night and causes things like blood to "luminesce." Tr. at 407.

[3] Our review of the photograph of the "letter opener" indicates that it is, indeed, a knife.

to hold onto the decorative knife, and he did not tell her when he would need it back.

[8] Coffin took the decorative knife to her friend Jeffrey Thomas, and she told Thomas that Millen had given it to her. Thomas contacted the Sheriff's Department, and Detective Fischer met Coffin and Thomas at a nearby location. Coffin gave the decorative knife to Detective Fischer. Forensic testing revealed no blood on the knife and an insufficient amount of DNA to be used in further analysis.

[9] On October 2, the State charged Millen with murder; abuse of a corpse, a Class D felony; two counts of obstruction of justice, Class D felonies; possession of methamphetamine, as a Class D felony; possession of paraphernalia, as a Class A misdemeanor; and false informing, as a Class B misdemeanor. Prior to trial, the State dismissed the two possession charges and amended the charging information to allege that Millen was a habitual offender. A jury found Millen guilty of obstruction of justice and false informing and adjudicated him to be a habitual offender and acquitted Millen of the remaining charges. The trial court entered judgment of conviction accordingly and sentenced Millen to an aggregate sentence of seven and one-half years executed. This appeal ensued.

## Discussion and Decision

[10] Millen contends that the State presented insufficient evidence to prove that he committed obstruction of justice. In reviewing a sufficiency of the evidence claim, we do not reweigh the evidence or assess the credibility of the witnesses.

*Sharp v. State*, 42 N.E.3d 512, 516 (Ind. 2015). Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict, and we will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

[11]   To prove obstruction of justice, the State had to show that Millen altered, damaged, or removed the decorative knife with intent to prevent it from being produced or used as evidence in any official proceeding or investigation. Ind. Code § 35-44.1-2-2(a)(3) (2013). On appeal, Millen concedes that the evidence shows that he removed the decorative knife from the campsite, but he maintains that the evidence is insufficient to prove that his "intent to remove the [knife] was to prevent it from being produced or used as evidence in an official investigation." Appellant's Br. at 10. In particular, Millen asserts that, given his testimony that he gave the decorative knife to Coffin's fiancé in exchange for money, and given that the decorative knife "had already been inspected and analyzed by police and then returned to his possession" and "it appeared that [Millen] was no longer a person of interest in the investigation" at the time, the evidence is insufficient to prove the intent element. *Id.* at 11. We cannot agree.

[12]   The intent element may be established by circumstantial evidence and may be inferred from the actor's conduct and the natural and usual sequence to which such conduct usually points. *McElfresh v. State*, 51 N.E.3d 103, 109 (Ind. 2016). Here, the State presented evidence that: Millen repeatedly denied having recognized or known Pollack and only admitted to knowing him after detectives found surveillance video of Millen using Pollack's EBT card; Millen

denied having any weapons, including knives, at the campsite, but detectives found two knives there in their search; shortly after detectives searched Millen's campsite, Millen told Coffin, a recent acquaintance, that Millen was being investigated in relation to Pollack's murder and, giving no reason, asked Wade and Coffin to keep for him indefinitely the decorative knife; and the evidence shows that the detectives had conducted a canine search of Millen's campsite within a few weeks of Millen's giving the decorative knife to Wade and Coffin.

[13] The evidence and reasonable inferences therefrom are sufficient to prove that Millen knew that he was still under investigation for Pollack's murder when he gave the decorative knife to Wade and Coffin in an effort to prevent it from being produced or used as evidence in the criminal investigation. Millen's contentions on appeal amount to a request that we reweigh the evidence, which we will not do. The State presented sufficient evidence to prove that Millen committed obstruction of justice.

[14] Affirmed.

Vaidik, C.J., and Baker, J., concur.